on Election Integrity, et al. Mr. Rotenberg for the appellate, Mr. Tenney for the appellees. Mr. Rotenberg, good morning. Good morning, and may it please the Court. I'm Mark Rotenberg for EPIC. With me at Council table is Helen Butler.  I'll make three brief points at the outset and reserve one minute for rebuttal. The first is that the Presidential Commission on Election Integrity failed to undertake and publish a privacy impact assessment that was required by Section 208 of the E-Government Act. The second is that the Commission's action is subject to judicial review by this Court under Chapter 7 of the APA. The third point is that EPIC is entitled to a preliminary injunction. We have satisfied the four-factor test set out by this Court in Shirley and League of Women Voters. The four factors require that we establish likelihood of success, irreparable harm, balance of equities, and also the public interest. You are going to get to standing. To the extent you have a question on standing, yes. The lower court found that EPIC had both organizational standing and informational standing. Is the organization a suitable plaintiff for a violation of a requirement that appears to be aimed at protecting the privacy of people who get these questionnaires? Judge Williams, we believe that... Or whose names are communicated in the questionnaires. So, to your point, the statute set out an obligation for government agencies to undertake privacy impact assessment for the purpose of protecting privacy and to promote transparency and accountability in government practices. Our organization, the Electronic Privacy Information Center, was established to focus public attention on emerging privacy and civil liberties issues. I understand that, but the Supreme Court seems to take the view that in assessing standing, particularly standing which is created by a congressional mandate, one should look... I'm thinking of the Pacayo case. I may not be pronouncing that right. Which was clearly designed to protect people from misinformation in their credit files, but it doesn't protect everybody against all misinformation. It does seem to be a question of degree, and I have to say that EPIC does not seem central to the particular interests protected here. Well, as I indicated earlier, our mission is to inform and educate the public about emerging privacy issues. We are named the Privacy Information Center, but a third point is that we have previously pursued privacy impact assessments issued by other federal agencies. In fact, there are two opinions from district courts in this circuit concerning our Freedom of Information Act cases, precisely to obtain the type of information that we saw here. What was of such great concern to us, and the reason that we brought the action, is that the Presidential Advisory Commission simply failed to undertake the privacy impact assessment and to publish the privacy impact assessment, which we would routinely be able to access under Section 208. And to the standing point also under this circuit's previous decision in PETA, which was just two years ago, we have both the type of harm that the statute contemplates, and of course we also have to expend additional resources because the commission failed to do what it was supposed to do. I think if you're injured in your mission, the spending of resources to offset that injury is unnecessary, but cases have so said. But anyway, go ahead. Well, I take your point. And the other standing issue before the Court today is informational standing, which we think is established under both of the circuit's recent opinions in Friends of Animals v. Jewell. The lower court relied on the second case, which in fact did not find standing, but it was sufficient in terms of the test that was set out to find informational standing to Epic. We also argue in our briefs that under the first Friends of Animals case, where standing was found under Section 10 of the Endangered Species Act, we would certainly have standing as well. The third standing... plaintiff and the plaintiff's role in the enforcement of that statute seemed to be much more central than your role in the enforcement of this particular provision. Well, as to our interest, it is central to our mission, and I will say that this data collection undertaken by the Presidential Advisory Commission was absolutely unprecedented. There has never been a similar effort to gather state voter records, detailed records, Social Security numbers, military service, home address, prior voting information... Well, you speak of its breadth, and perhaps you're right on that, but its potency seems to be very low. You speak of demands, but they requested, and they seem to have no power to do anything more than request. Well, under the terms of the Privacy Impact Assessment, coming back to Section 208, those factors which I just described, which concern the scope of the request and the detail of the request and the risk of harm, are precisely the factors that the Commission was expected to consider prior to the collection of data. I understand that. So that would be another key consideration in this case. The Section 208 obligation to publish the Privacy Impact Assessment is an obligation that occurs before the data collection takes place, and that simply did not happen here. If you do have standing, am I correct in thinking whether the Advisory Committee has an obligation to issue a PIA depends upon whether it's an agency within the means of the E-Government Act? Well, that's correct, and we think that's the core issue here, because the lower court relied on the 2009 CREW test, which was a Freedom of Information Act case that incorporated the SUSI doctrine, which looks at the substantial independent authority of an agency. We think that wasn't necessary here. In fact, it was incorrect. The relevant definition for the Privacy Impact Assessment obligation is found in Title 44, and there in 3502 in the Code, it says simply, an establishment in the executive branch of government. Well, we've already said, though, that 3502 clarifies 551 and essentially equates, I think, 3502 and 552. Well, no. In fact, we think there's a sharp distinction between the Title 44 definition and the 552F definition, which the government relies upon in its briefing. What's the sharp distinction? Well, the sharp distinction is that the 552F definition relies on the SUSI doctrine and emerges in Freedom of Information Act cases where there's a competing constitutional concern about the ability of people close to the President to give confidential advice to the President. And so when in SUSI, a Freedom of Information Act case, the Court said we have to look to that interest, that doctrine was incorporated by means of the 1974 legislative history as to 552F. But it did not touch 551, and it most certainly did not touch Title 44. There's no competing interest here in the confidential advice to the President. In fact, as this Court had suggested in SB, quite the opposite. I'm sorry, SB is a 1996 opinion of the Circuit. The Court actually draws the distinction and says, whereas in the Freedom of Information Act realm, we're concerned about the confidential advice to the President, and we look more closely at the nature of the agency, that issue's simply not present here. Presumably, whatever the Commission is doing, it's doing subject to FACA, and the recommendations it will make will be public recommendations. So we think this is the mistake of the lower court, and also the government's arguments can largely be distinguished. It went down the 552F road. It didn't need to. You have judicial review in Chapter 7. You have review under Section 701 and 702, and we think that's sufficient to reach the outcome which we're seeking, which is the assurance of the preliminary injunction. Just to go... When you say it may be sufficient, that's because of the trail that got you there, but my question was really... I think you've already answered, but the question went to whether there's really any difference between 552 and 35. Well, Judge Ginsburg, I think the difference is in part found in two cases in which you were on the panel, Armstrong 1, the 1991 case, and Armstrong 3, the 1996... Armstrong 3, right? Right. Okay. That latter didn't play much role in your argument, as I recall. Well, only to establish... You kept saying Armstrong 1 without reference to the other one. Right. Well, Armstrong 1 is significant because you found judicial review under Chapter 7, which is to say through 701, of the record-keeping practices of the National Security Council, which subsequently you decided in Armstrong 3 was nonetheless not subject to obligations under the Freedom of Information Act. There have been some intervening changes in the situation. Yes, but I believe that Armstrong 1 is still good law, and I believe it is an agency subject to judicial review under Chapter 7, even though it may not be subject to review through the agency definition in 552F. And if I may make a final point here, of course, the four-factor test was briefly considered by the lower court. The lower court looked simply at the question of whether the Commission had an obligation under Section 208 of the Government Act to undertake the Privacy Impact Assessment. The lower court concluded that the Commission was not an agency and therefore did not have that obligation. But of course, in addition to the fact we think that holding was incorrect, we think the other three factors also weigh in EPIC's interest. There's clearly the irreparable harm by the failure to publish the Privacy Impact Assessment as against the Commission's interest in doing its work. The balance of equities must also necessarily consider the privacy interest of the voters whose personal data is being collected by the Commission. So you see, if you look at the balance of equities analysis, it's not just the Commission versus EPIC. The information in question is already publicly available, right? Well, we dispute that characterization. Well, the request is for publicly available. We understand that, but the request is also for detailed voter history information. It's also for Social Security information. Do you regard this as whether it's publicly available? It's ambiguous, Your Honor. The procedure that the states would normally follow for a similar request is quite elaborate. If you or I or even a political committee wanted to get this type of voter data from a state agency or a state election official, we would have to fill out forms. We'd have to establish security procedures for receiving the data. And those requests would then be reviewed by the election official to determine which information the state could Is there any indication that any state will provide non-public information in response to this request? It's a difficult determination for us to make because we don't know, in fact, which data the states have provided to the Commission, which is, of course, part of the purpose of the privacy impact assessment. Do we know that any state has provided information? I believe some states have provided. Certainly, Arkansas, in the first instance, provided the data. And when we filed the initial complaint, we had also established that the technique that the Commission had used to receive the data was not secure. In fact, if you went to the website Thank you for pointing it out to me. We appreciate that. But you see, that demonstrates on the record in this case that the concern we have is not theoretical. We're not talking about what might happen to data that is not protected under the requirements of a privacy impact assessment. We can actually point to the record in this case and show what happened when the Commission collected the data. And we are still in the dark. We still don't know if the Commission has answered the questions that Section 208 requires. How will the data be used? Who will have access to it? For what purpose is it being collected? Have they created a Privacy Act system of records that requires a Privacy Act notice? None of these questions have been answered by the Commission. And we think this is precisely the reason that the preliminary injunction is necessary. Well, it makes it difficult for you to show irreparable harm when you don't know what's happened. Well, the irreparable harm flows from the informational injury, which was the failure to obtain the Privacy Impact Assessment, which would have detailed the Commission's compliance with all of these requirements. Yes, that's also in the balance of equities. And finally, if I may just speak to the fourth factor. As I said, the Court below barely touched upon these issues, but they're all relevant to your consideration for a preliminary injunction. And the public interest here, frankly, is quite substantial. As we wrote in our initial complaint to the Court, this nation does face a crisis of data breaches and identity theft. We hope in the paper every day, and we read about the improper breach of personal data. This data, voter data, is the most sensitive data in our form of government. And we know on the record that it was also the target of a foreign adversary during the 2016 election. It's actually difficult for us to imagine a case where there's a more compelling claim to undertake, complete, and publish the Privacy Impact Assessment that Section 208 of the Government Act requires. That, of course, is the reason that we brought this case, and that's the reason that we're seeking the preliminary injunction. All right. Thank you. Mr. Tanning? Thank you. May it please the Court, I'd like to start on the standing issue. EPIC is not injured by the commission action that it is seeking to enjoin in this case. And so its claim is that it has an independent injury from the process that would have, in its view, appropriately led up to that decision. And as the earlier colleague pointed out, in such circumstances, the Supreme Court and this Court have demanded that the cognizable injury that you claim in information be one that's specifically granted to someone in your position. And the Supreme Court said in Lujan, for example, that if you're seeking standing because you think an environmental impact statement should have been prepared and you live on the opposite side of the country from the proposed facility that would be created, then that's not a sufficient basis for standing. And in this case, EPIC, because they've, in this Court, not asserted that they have any interest in the actual action that is at issue that they're seeking to enjoin here, they're quite similarly situated to an entity that lives on the opposite end of the country from an environmental project. Suppose they had members. I understand they don't have members, but suppose they had members whose information as voters was being collected. Well, I mean, the district court held in the alternative that those members might not have standing to challenge the action because any harm to them would be speculative based on the publicly available nature of the data. But if your question goes to suppose they had a member who actually would have standing to enjoin or to challenge the action that they're trying to enjoin, then of course they could say one of the reasons that that action was unlawful was the failure to publish a privacy impact assessment and they could raise their challenge that way. The Supreme Court in this Court have made quite clear that if you assert this sort of procedural injury, the regressibility prong of standing is relaxed such that you don't have to demonstrate that if they had done the assessment they wouldn't have collected the data at the end of the day. But some of the cases do seem to allow an organization to have organizational standing because it's interested in some way in the activity of the agency in question. And that seems to be interested and does manifest its interest. Yeah, there are cases that have held that there's standing for informational purposes. A mere interest in the subject matter of the agency or commission in this case proceeding has not been sufficient. And so you can draw contrasts. If you start from... I'm sorry. Go ahead. I mean the informational injury cases began with or at least are now reliant on the Supreme Court's decision in FEC versus Aikens which was an election case in which there were people who wanted to participate in the election and Congress had made quite clear that there were certain disclosures that should be made so that voters and other participants in the electoral process would have the information they need to cast an informed ballot. And similarly... That's obviously a strong case but then the usual evolution of judicial decisions goes down, down, down in terms of the degree of concern that the plaintiff party has. I mean I do think that's a strong case. I mean at the other end of the an organization that has an interest in the environment but lives on the opposite end of the country from the project that's at issue or somewhere is the Earth Island Institute where someone had an interest again in the agency engaging in a notice and comment process and providing more information. But that wasn't held to be sufficient. And obviously you have to align the cases in the middle. But neither of the FEC is a case from this election but it was somebody who wasn't trying to participate but was trying to get more enforcement and this court held that that was insufficient as a basis for standing. Then there's the Friends of Animals case that was cited earlier and there too a key distinction is that Congress made quite clear that it wanted to facilitate participation in this process, the agency's process in that case of granting permits. And it wanted to facilitate participation by the sorts of groups who were filing that lawsuit. By advocates for animals and Congress had strong language repeated several times in the statute which was quoted and italicized by this court about how the information should be made available at every stage of the process, that both the application for the permit and the agency's determination of how to look at that information would be made available. And you contrast that here, we have a statute whose express statement of purpose is to ensure sufficient privacy for personal information. And you have a plaintiff whose personal information is not at issue. And it's clear that the purpose of the privacy impact assessment is not to provide information to the public. This isn't fundamentally a disclosure statute. This is a statute to make sure that the government, when it applies, we don't think it does apply here but when taking their allegations as true for standing purposes, this is a provision that applies to require the government to take into account these privacy concerns when the government is making its own decisions, all to the end of getting better government decisions and having better decisions that make sure that the government is accounting for the interests of individuals who are not before the court in this case. Individuals whose privacy would be at issue with these statements. And there's not a case like that in which somebody has not had, in which there's something that's made for internal government decision making on an issue in which the plaintiff does not have a cognizable interest and informational standing for that. You can't come into court, you know, if you say I'm interested in small business, the agency has to prepare a regulatory flexibility statement and I'd like to look at that and make some arguments about that. It's never been thought that you could come into court and challenge an agency action that doesn't actually cause you any cognizable injury with a claim like that. And that's really what's happening here. This is much more in the category of generalized grievance. They have an interest in what's going on and they want to weigh in but they're just not the proper plaintiffs here. How about their argument about their self-inflicted budget choices, as I see it anyway. I see a world of difference between this case and PETA. I agree with that. I mean, one, there are several differences. One obvious difference is that in PETA at least they were trying to that wasn't cause of action for agency action unlawfully withheld and they were saying the agency has to do something affirmative and if they do that then there's this, you know, there's all this work that the agency would be doing that we have to sort of substitute for because we're doing all this other work. There's nothing like that here. They're trying to prevent the commission from doing something. And they haven't taken on some burden. So I agree those cases are quite different. I take it their argument is that in terms of protecting privacy generally, the activities of the commission represent regardless of what they do, a setback to that mission. Right. I mean, to their sort of abstract mission. But I don't think that they don't have something concrete that they're doing that's being interfered with. If it were true that any time you said we're an agency, we're an organization that we have standing, then all the environmental plaintiffs could say we support a better environment and this agency is taking steps that will make the environment worse so we have standing. At that level of generality, they can't really fit themselves in any of the cases. I see my time is almost up. I don't have a lot to say on the merits. I guess I would just mention the effort to draw a distinction between the E-Government Act and the FOIA. Those statutes are reproduced on pages A-7 and A-8 of our appendix. And you'll see the language there. And you can't draw fine lines between those. It's quite clear. Just in any context, forgetting which of these statutes we're talking about, federal advisory committees have never been thought to be agencies that are subject to suit under the APA, to the FOIA, or to any other statutes that are applicable to agencies. And this is just a classic advisory committee. It says in the executive order itself that it's solely advisory and they're tasked with preparing a report for the president. So we think that although we differ with the district court on standing, we think the district court was quite right if you do reach the merits. The APA uses the same words in Section 551 and Section 701, I believe. Those were originally actually literally the same language. They were split in a non-substantive amendment when the judicial review provisions and the substantive provisions were split up. There's no indication that Congress intended to take the 551 definition, which was the very definition that was at issue in SUSE, which established the substantial independent authority test. There's no indication that Congress intended to jettison that just when it recodified it into two separate sections. And they haven't cited any case for that. Well, I mean, SUSE set out the test, substantial independent authority. That test was applied in those other cases. And I mean, either way you look at it... I mean, if anything, the other cases, and I think this was discussed in the Dong v. Smithsonian Institute case, if anything, the FOIA definition says for purposes of the FOIA, the term agency shall include, and then it rattles off a new list of things. And so if anything, the FOIA cases are adding something. I think was how this court put it in Dong. But under any of these definitions, the reason we set up the brief that way is that SUSE said substantial independent authority. We don't think this agency has substantial independent authority. Whichever statute you put that under, we think the result is quite the same. There's no case under any of these provisions. The citation of Armstrong, Armstrong did not say anything like you can have a cause of action under the APA against someone who doesn't have substantial independent authority. There's no language, anything like that in Armstrong. Armstrong was a cause of action, among others, against the Archivist of the United States for not taking action to address alleged deficiencies in record keeping. The Archivist of the United States is an agency for purposes of the APA, so there wasn't a fight in that case about whether the APA Section 701 applied. There's no holding there to talk about. The NSC was involved, but the way the Federal Records Act works, the head of a government agency has some responsibilities, and then the Archivist also has responsibilities. If you thought that the Archivist was inadequately doing what the Archivist was supposed to do, you could file an APA cause of action against the Archivist. There's no discussion in the case about whether you could file a cause of action against the NSC under Section 701. If you look at the case, you won't find that. These are all follow-ons of the same case. It has been made clear. I forget in which case. I apologize for that. Our fundamental point here is just that the advisory committees under any of these statutes are not agencies, and the District Court was quite right to hold that, if you reach the question. Is there any further questions? Thank you. Three brief points. Contrary to counsel's claim, in fact, this Court has found that a Presidential Advisory Commission is subject to the APA. That was the FACA enforcement in comic rigor, which was 1999. Secondly, the counsel is describing a Privacy Act-style statute to argue that EPIC doesn't have standing. Section 208 has a very different purpose. It's the publication about the government's practices that are at issue in Section 208, and that's, of course, core to EPIC's mission, which goes to my third point regarding the application of PETA to this case. It wasn't a generalized harm or self-inflicted expenditure. When we learned that the Commission had not undertaken the Privacy Impact Assessment, not only did we seek related information through the FOIA, we contacted the State Secretaries to alert voters that their information was not being protected as required by Section 208. So we believe that we fall quite clearly in the PETA zone for standing as an organization, and also under Friends of Animals for informational standing. Thank you.
judges: Henderson, Williams, Ginsburg